# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JANE POVAH**,                                          *Chapter 7*
    Debtor                           *Case No. 09-17656-JNF*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**JANE POVAH,**
    Plaintiff
v.                                                       *Adv. P. No. 10-1039*
**HANSBURY AND FINN, INC.,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

Two matters are before the Court: 1) the Motion to Convert Case to Chapter 13 filed by Jane Povah (the "Debtor"); and 2) the Motion to Dismiss Adversary Complaint pursuant to Fed. R. Civ. P. 12(b)(1), which is made applicable to the adversary proceeding by Fed. R. Bankr. P. 7012(b), filed by Hansbury and Finn, Inc. (the "Defendant"). The Defendant objected to the Motion to Convert Case to Chapter 13, and the Debtor objected to the Motion to Dismiss Adversary Complaint. The Court heard both motions on July 25, 2011. The Court had scheduled a hearing on the Motion to Convert Case to Chapter 13 for

1

August 9, 2011, but the parties agreed that the Court should consider the Motion to Convert Case to Chapter 13 in conjunction with the Motion to Dismiss. At the conclusion of the hearing, the Court took both matters under advisement. Neither party requested an evidentiary hearing, and both parties referenced facts alleged in the Complaint or made part of the Joint Pretrial Memorandum. With respect to both Motions, the parties also filed extensive briefs. The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

Because both parties referenced matters in the record and because neither party requested an evidentiary hearing, the Court shall refer to the record of proceedings where necessary to determine the Motion to Convert Case to Chapter 13.

The issues presented include whether the Court has the discretion under 11 U.S.C. § 706(a) to convert the Debtor's Chapter 7 case to a case under Chapter 13 where the Debtor commenced her case in 2009 by filing a Chapter 13 petition; whether, if the Court has discretion, the Debtor sustained her burden with respect to the reconversion of her case to Chapter 13; and whether this Court has jurisdiction to entertain the Debtor's adversary proceeding against the Defendant where the Chapter 7 Trustee abandoned the Debtor's causes of action against the Defendant pursuant to 11 U.S.C. § 554 and filed a Report of No Distribution, and the Debtor has received a Chapter 7 discharge.

**II. PROCEDURAL BACKGROUND**

    A. <u>The Main Case</u>

The Debtor filed a Chapter 13 case on August 11, 2009. Prior to filing her Schedules,

2

Statement of Financial Affairs, and other required documents, she moved, on September 21, 2009, to convert her Chapter 13 case to a case under Chapter 7.  The next day, the Court granted the Debtor's motion.   On October 15, 2009, almost two months after the commencement of her case, the Debtor filed Schedules A-H, and Form 22C, the Statement of Current Monthly Income and Means-Test Calculation.

On October 26, 2009, the Debtor amended Schedules A-C.  Three days later, she filed her Statement of Financial Affairs.  On Amended Schedule A-Real Property, the Debtor listed an ownership interest in 7 Lincoln Avenue, Manchester, Massachusetts (the "Property") with a current value of $492,500.  On Amended Schedule B-Personal Property, the Debtor listed assets with minimal value, except for a 2007 automobile with a value of $10,000.   On Amended Schedule C, she claimed the state exemptions, including the homestead exemption available to her pursuant to Mass. Gen. Laws ch. 188, § 1.[1]

On Schedule D-Creditors Holding Secured Claims, the Debtor listed the Defendant with a claim secured by a mortgage on the Property in the amount of $290,000.   On Schedule F-Creditors Holding Unsecured Nonpriority Claims, she listed claims totaling $16,757 arising primarily from the use of credit cards.

Between the filing of the Debtor's original Schedules and the filing of her amended Schedules, the Defendant filed a Motion for Relief from Stay.  In its Motion, it asserted that it was the current holder of a first mortgage on the Property in the sum of $210,000, that the

---

[1] The Defendant objected to the Debtor's claimed homestead exemption.  It later withdrew its objection after the Debtor filed a further amended Schedule C omitting a claimed exemption in the Property.

mortgage secured a note in the original sum of $209,280.41, that the outstanding indebtedness with respect to the note and mortgage was approximately $285,355.75, that additional encumbrances existed totaling approximately $33,061.45, and that the fair market value of the Property was $315,200.

On October 29, 2009, prior to determining the Defendant's Motion for Relief from Stay, the Court dismissed the Debtor's Chapter 7 case for failure to timely file Schedules I and J-Current Income and Expenditures of Individual Debtor(s) and other required documents.  On November 3, 2009, the Debtor moved to vacate dismissal and reinstate her Chapter 7 case.  Additionally, she also filed an Opposition to the Defendant's Motion for Relief from Stay.  On November 9, 2009, the Court denied the Debtor's Motion to Vacate Dismissal and Reinstate Case as the Debtor still had not filed a list of postpetition creditors. On November 16, 2009, after the Debtor filed the missing document, the Court granted her Motion to Vacate Dismissal and reinstated her Chapter 7 case.  Three days later, the Debtor moved to amend Schedules A, B, C and D.  While the Debtor's case was dismissed, the Court denied the Defendant's Motion for Relief from Stay as moot.  The Defendant did not file another Motion for Relief from Stay after the case was reinstated.

On Amended Schedule A, the Debtor valued the Property at $294,350.69; on Amended Schedule B, she listed the following asset with an unknown value:

> Contingent and unliquidated claim under Massachusetts laws regulating unfair and deceptive trade practices, against Hansbury & Finn, Inc. for predatory lending.  The current value of Ms. Povah's interest is unknown. The primary value of the claim is that they [sic] serve as offsets and defenses to Ms. Povah's obligations under the terms of the mortgage.

4

On Amended Schedule C, the Debtor elected the federal exemptions and claimed her cause of action against the Defendant as exempt pursuant to 11 U.S.C. § 522(d)(5). She did not claim an exemption with respect to the Property under 11 U.S.C. § 522(d)(1). On Amended Schedule D, she added three additional lienholders with secured claims against the Property, including Omni Care, Inc. with a claim in the sum of $2,204, Operating Co. LLC with a claim in the sum of $29,917.99, and the Town of Manchester with a claim in the sum of $938.66. Utilizing her revised valuation for the Property, and valuing the Defendant's secured claim at $290,000, the Debtor listed Operating Co. LLC's claim as only partially secured. The Debtor did not disclose whether the liens held by Omni Care, Inc. and Operating Co. LLC were consensual or judicial liens.

On Schedules I and J, the Debtor disclosed that she is retired and receiving Social Security income. She set forth average monthly income of $1,021 and expenses of $3,328.02, including the monthly mortgage obligation to the Defendant in the sum of $2,221.55.

On January 12, 2010, the Debtor received a discharge of dischargeable debts. On February 6, 2010, she commenced an adversary proceeding by filing a complaint against the Defendant. On February 9, 2010, the Chapter 7 Trustee filed a Report of No Distribution. On April 12, 2010, the Debtor, through her attorney, moved to dismiss her case pursuant to "11 U.S.C. § 1307(B)" [sic].

The Court denied the Debtor's Motion to Dismiss, as the case had been converted to Chapter 7. On March 24, 2011, the Chapter 7 Trustee filed a Notice of Intent to Abandon Property, namely the causes of action set forth in the Debtor's adversary proceeding

against the Defendant.  Three months later, the Debtor moved to convert her Chapter 7 case

to a case under Chapter 13, which Motion is now before the Court.  As grounds for her

Motion, the Debtor stated:

> Subsequently, while reviewing and investigating the Debtor's options, it came to the attention of Debtor's counsel that the Debtor possessed a viable claim against Hansbury for extraordinarily egregious predatory lending activities in connection with her home loan. In particular the loan was a one-year, negatively-amortizing balloon note at a nominal interest rate of 12% with well over $10,000.00 in fees. The monthly payments called for amounts that were more than double her total monthly income and, with fees included, the effective interest rate of the loan was far in excess of the Massachusetts Usury Laws. Debtor is an elderly woman who at the time the loan was made had no income other than her monthly social security benefit, and no asset other than the home which is at issue in this action. Hansbury is a real estate development firm which at first sought to acquire the property outright, and then fashioned this loan product when the Debtor refused to sell. Under Massachusetts state consumer laws, Chapter 93A, it is an unfair or deceptive business practice to make a home loan based solely upon the value of the collateral, 940 CMR 3.06, as is originating a loan without checking income information of the borrower or making a loan on terms the borrower is unlikely to be able to repay. Id., Commonwealth v Fremont Investment and Loan, 452 Mass. 733 (2008).

In her Motion to Convert, the Debtor stated that she would

> propose to make a modest, yet meaningful monthly payment to the Chapter Thirteen Trustee and will also propose that Hansbury's claim will be dealt with in the following manner:  The plan will propose that the debtor will continue to aggressively seek Reverse Mortgage funding and, in the event Hanbury's [sic] claim survives the Adversary Proceeding Debtor will use these funds to pay 100% of outstanding claims through the plan. Alternatively, in the event Hansbury's claim survives the Adversary Proceeding and if, by that time, the Debtor has been unable to secure reverse mortgage financing, Debtor will surrender the home in full satisfaction of Hansbury's claim.

In conjunction with her Motion to Convert, the Debtor filed an Amended Schedule

6

J, but she did not submit a proposed Chapter 13 plan in support of her Motion to Convert. By eliminating a monthly payment to the Defendant and reducing her monthly expenses to $970.47, she reported monthly net income of $50.53 on Schedule J.  The Debtor's Schedule J reflected a rent or home mortgage payment in the sum of $467; and expenses for telephone ($71), food ($200); transportation ($50); and a monthly installment payment for her automobile in the sum of $182.47.  She did not list any monthly expenditures for clothing, laundry, dry cleaning, medical and dental care, recreation, charitable contributions, or real estate taxes.

The Debtor did not attach an affidavit to her Motion to Convert Case to Chapter 13. She did not support her assertions that she was contacting and interviewing contractors and actively seeking a reverse mortgage with a list of names or entities and the dates and times she spoke with contractors or representatives of mortgage lenders.

B. The Adversary Proceeding

As noted above, the Debtor commenced an adversary proceeding against the Defendant on February 6, 2010.  In the introduction to her Complaint, she alleged that the loan she received from the Defendant was a "High Cost Mortgage" within the meaning of Mass. Gen. Laws ch. 183C, that the mortgage loan satisfied virtually none of the requirements for such loans, that at the time she was solicited for the loan her sole source of income was Social Security and that based upon her income and obligations "it should have been clear to any lender that there was no possible way Ms. Povah could make the payments that were required by this loan."  In her Complaint, she disclosed that she was

7

currently residing in a senior/disabled unit in public housing located in Beverly, Massachusetts. She alleged the following additional facts in her Complaint.

Defendant holds a $210,000 mortgage, dated June 6, 2007, on the Property. The Mortgage is captioned "Massachusetts Fixed Rate Mortgage and Construction Credit Line." The loan has a fixed term of one-year, with an annual interest rate of 12%.

The Debtor alleged that, on September 12, 1988, she borrowed $75,000 from Eastern Bank, secured by a mortgage on the Property. She also alleged that at some point in time before February of 2005, while she was living alone and unable to care for herself, she was involuntarily committed to a nursing home. On April 18, 2006, the Board of Health for the Town of Manchester, Massachusetts condemned the Property . On June 28, 2006, the Essex County Superior Court, Department of the Trial Court, appointed, Attorney T. Richard Cuffe, as Receiver for the Property. According to the Debtor, on August 1, 2006, Attorney Cuffe, obtained a $200,000.00 line of credit from Equitable Cooperative Bank, secured by a mortgage on the Property, for purposes of repairing the Property and correcting existing health code violations. According to the Receiver's final account filed in the Superior Court on February 8, 2007, he expended $43,692 to remedy the condition of the Property. The Debtor alleged that, on August 3, 2006, the $200,000.00 credit line was transferred from Equitable Bank and assigned to Amro Mortgage Group Inc.

On February 23, 2005, the Debtor was released from the nursing home and moved into a public housing apartment in Beverly, Massachusetts. Before entering the nursing home, the Debtor was supplementing her income and paying her bills, including the

Eastern Bank mortgage, with money from a trust fund left to her by her parents. The trust fund was entirely depleted during her stay at the nursing home, and, according to the Debtor, she was unable to make monthly mortgage payments to Eastern Bank, a circumstance which precipitated foreclosure proceedings.

According to the Debtor, sometime in May 2007, she received an unsolicited visit at her apartment from a woman, who identified herself as "Diana Morrison" ("Morrison") and who represented that she was a Title Examiner. The Debtor alleged that Morrison stated that she had seen a Notice of Foreclosure at the Registry of Deeds and that she could assist the Debtor in saving her home. The Debtor alleged that she understood from Morrison that if she were to obtain a loan from the Defendant, the foreclosure would be stopped, her mortgage would be paid off, and she would receive additional funds to repair her condemned home. The Debtor alleged that she was made to understand that with the money to perform repairs she could return to live in her home, after which she could easily obtain a reverse mortgage on the property to pay off the Defendant's loan and assist with her regular expenses.

On June 6, 2007, the Debtor alleged that she attended a closing at which a representative of the Defendant was present. She indicated that public records reveal that, from the $210,000 in loan proceeds, the following liens were paid:

A) Discharge of Eastern Bank Mortgage $59,752.79
B) Receiver Attorney T. Richard Cuffe, Jr. Esq. $43,692.57
C) Highland Partners (equity loan) $24,800.00

According to the Debtor, the total liens paid from the proceeds derived from the

9

Defendant's loan totaled $128,245.36. The Debtor alleged that it was unclear what happened to the balance of $81,754.64 in remaining loan proceeds ($210,0000.00 – 128,245.36 = $81,754.64 ).

The Debtor was unable to keep up with the monthly payments on the loan, which totaled approximately $2,200.00 per month because her sole source of income was a monthly Social Security check in the sum of $1,021.00, less than half of what she needed to make payments to the Defendant. According to the Debtor, the monthly payments on the loan exceeded her monthly income by $1,169.00.

On March 20, 2009, the Defendant initiated a foreclosure proceeding, and, on or around August 11, 2009, the Debtor received a notice of foreclosure sale scheduled for August 14, 2009, which precipitated the Debtor's decision to commence a bankruptcy case.

The Debtor alleged that, on December 15, 2009, she served upon the Defendant's counsel, a draft of the current complaint to serve as a Chapter 93A demand letter notifying it of her allegations that it engaged in unfair and deceptive practices, and, in an effort to clarify the whereabouts of the $81,754.64 in loan proceeds. The Debtor, through her counsel, requested that the Defendant produce a copy of the HUD settlement sheet along with any associated documents. According to the Debtor, none of the requested documents have been provided. In her Complaint, the Debtor alleged that on February 5, 2009, the Defendant filed an Objection to the Debtor's Claim of Homestead Exemption Under Mass. Gen. Laws. ch.188, § 1 in which it argued that because "the Debtor is not capable of effectuating the substantial rebuilding of the property necessary to make it

10

habitable" she is not entitled to her claim of homestead. The Debtor, in her Complaint, disputed that assertion, alleging that she did not view her economic challenges as insurmountable. She further alleged that she had found a few contractors that had agreed to make some of the repairs and defer payments. She also alleged that she had made numerous inquiries regarding her eligibility for a Reverse Mortgage and/or a bridge loan until she could get a Reverse Mortgage.

The Debtor, in her Complaint, repeated that she was elderly and living on a fixed income. She alleged that the Defendant should have been aware of and had access to her income information at the time it solicited a loan from her. The Debtor alleged that the loan was made on abusive terms with prepayment penalties and exorbitant fees and costs, adding that it contained a complex balloon rate structure, incomprehensible to someone of her age, experiences and infirmities, along with an extraordinarily high effective interest rate. According to the Debtor, the loan was a subprime, fixed rate, one-year loan, with a nominal interest rate of 12%, plus two so-called discount points and 5% in additional fees. When insurance and taxes were included, a repayment amount in excess of $250,000.00 was to be due in a single payment at the end of the year. According to the Debtor, at the time the Defendant made the loan, the 5-year Treasury securities rate was 4.6%. She added that Massachusetts law uses the 5-year Treasury security rate as a rough way to assess the benchmark rate for purposes of determining whether a home loan is to be treated as a high-cost loan under Mass. Gen. Laws, ch. 183C. According to Mass. Gen. Laws ch. 183C, § 2, a loan is considered a "high-cost home loan" if its interest rate exceeds a comparable term

11

Treasury security by 8%, or if it provides for more than 5% of the total loan in costs and

fees, excluding "bona-fide discount points." Discount points are considered bona fide only

if they reduce the interest charged from the benchmark rate, which is based on the rates for

5-year Treasury Securities plus 4% points.

> According to the Debtor, at the time this loan was made,

> [R]elevant Treasury Securities were getting approximately 4.6 percent, and adding 4 percent to that rate, the benchmark rate for this loan would have been 8.6 %. Since the interest charged was 12%, the discount points charged on this loan did not reduce the interest rate below the benchmark rate and so they cannot be considered bona fide discount points under Massachusetts law. Therefore the two points must be added to the 5% charged in fees so this was a high-cost home loan under Massachusetts law.

The Debtor also alleged in her Complaint that debt-to-income ratios are used in the

mortgage industry as a measure of a borrower's ability to repay the loan as it reflects the

percentage of a borrower's monthly income that would be needed to pay the monthly

mortgage obligation. She alleged that 50% is the maximum allowable debt to income ratio

under Massachusetts law and that standard underwriting practices require debt-to-income

ratios that are much less. The Debtor alleged that the debt-to-income ratio of the loan she

received from the Defendant, even excluding her tax and insurance obligations, was 246%.

The Debtor also alleged that the annual percentage rate ("APR") with respect to the

Loan was not disclosed, but that had it been it would have been in the range of 15%.

According to the Debtor, she was charged with over $14,000.00 in fees in order to close the

loan. She alleged that she was charged a loan discount fee of 2%, or $ 4,200, that she was

charged 5% in loan origination fees, and that she was charged other fees, for a total of over

12

$10,000, all of which was folded into the interest-only loan at a rate of 12%. She concluded that "had she been able to make the payments under the loan at the end of the year, she would have paid nearly $30,000 in interest and paid off none of the principal."

The Debtor alleged that the loan was a "stated income," or "no/low documentation" loan and that the Defendant likely had access to and verified her income from publicly available information.  She alleged that it was well aware of her inability to repay the loan according to its terms.  The Debtor alleged that, although the Defendant understood the loan to involve significant risk of non-payment based on Debtor's advanced age, monthly income, and other infirmities, the Defendant was never at risk of loss due to its opportunity to foreclose on her valuable property.  She also alleged that "[e]ven in today's depressed property market, a foreclosure, if conducted, would make the Defendant whole" and that, if it purchased the property at a below-market price, it could realize a substantial profit on resale.  Finally, the Debtor alleged that the Defendant participated in, facilitated and profited from unfair and deceptive trade practices.

Based upon the foregoing allegations, the Debtor formulated six counts as follows: Count I:  Violation of M.G.L.c.183C; Count II: Violation of G.L. c. 183, § 28C and 209 C.M.R. § 53.01 et seq.; Count III: Violation of G.L.  c. 93A; Count IV: Unconscionability; Count V: Continuation of the Automatic Stay; and Count VI: Violations of Truth in Lending Acts. She requested actual, statutory, and multiple damages, injunctive relief in the form of a continuation of the automatic stay; declaratory relief that the loan terms and mortgage are unenforceable; and rescission of the mortgage.

13

The Defendant filed an Answer and Counterclaim consisting of a single count for breach of contract. It demanded a jury trial with respect to its counterclaim.

Following the entry of a pretrial order and Court-authorized extensions of the deadlines for the submission of dispositive motions set forth in the order, the Defendant, on December 13, 2010, filed a Motion for Summary Judgment in which it asserted that it was entitled to summary judgment as a matter of law on all counts of the Debtor's Complaint. The Court scheduled a hearing on the Defendant's Motion for Summary Judgment for February 23, 2011. On December 21, 2010, the parties filed a Joint Pre-Trial Statement, which contained facts pertinent to the Debtor's physical and economic circumstances before she executed the note and mortgage in favor of the Defendant.[2]

---

[2] In their Joint Pretrial Statement, the parties stipulated to the following facts as requiring no proof:

  1. The Defendant is a domestic [Massachusetts] corporation with a
  principal place of business at 151 Main Street, Wenham, Massachusetts.
  2. The Defendant corporation lists the following Directors/Officers:
  PRESIDENT PHILIP J. HANSBURY 84 LAKE DRIVE
  HAMILTON, MA 01982 USA
  TREASURER PHILIP J. HANSBURY 84 LAKE DRIVE
  HAMILTON, MA 01982 USA
  SECRETARY MARK FINN 151 MAIN STREET
  WENHAM, MA 01984 USA
  DIRECTOR MARK FINN 151 MAIN STREET
  WENHAM, MA 01984 USA
  DIRECTOR PHILIP J. HANSBURY 84 LAKE DRIVE
  HAMILTON, MA 01982 USA
  3. Plaintiff Jane Povah ("Plaintiff"), a Debtor in this Court, currently
  resides at 245 Elliott Street, Beverly, Massachusetts.
  4. The Plaintiff has been the record owner of the real estate located at 7
  Lincoln Avenue, Manchester, Massachusetts ("the 7 Lincoln Avenue
  property") since March 18, 1983.

5. On or about September 12, 1988, the Plaintiff borrowed $75,000.00 from Eastern Bank, secured by a mortgage on the 7 Lincoln Avenue property.

6. On January 26, 2004, the Plaintiff was removed from the 7 Lincoln Avenue property by Manchester officials after she was found living there in deplorable conditions.

7. Neither the Plaintiff, nor anyone else, has resided at the 7 Lincoln Avenue property since January 26, 2004.

8. After being removed from the 7 Lincoln Avenue property, the Plaintiff was taken to Beverly Hospital, where she stayed for one week; following that she was placed in a nursing home, the Montserrat of Beverly Nursing and Rehabilitation Center.

9. On February 23, 2005, the Plaintiff was discharged from the Montserrat of Beverly Nursing and Rehabilitation Center.

10. After being discharged from the nursing home, the Plaintiff moved to an apartment at 130 Summer Street, Manchester, Massachusetts.

11. In June of 2005, the Plaintiff moved to a public housing apartment at 245 Elliott Street, Beverly, where she has lived continuously to the present.

12. On April 7, 2005, the Manchester Board of Health obtained an administrative warrant to inspect conditions at the 7 Lincoln Avenue property from the Salem District Court.

13. On April 11, 2005, Manchester officials inspected the 7 Lincoln Avenue property and found so many violations of the town's building and sanitary codes that the property was determined to be unfit for human habitation.

14. Following the inspection, the Manchester Board of Health voted to condemn the Lincoln Avenue property and issued an Emergency Condemnation and Order to Vacate.

15. On August 24, 2005, the Plaintiff's legal representative notified the town of Manchester that the Plaintiff's plan was to secure a reverse mortgage in order to obtain the funds necessary to bring the 7 Lincoln Avenue property up to code.

16. At that time, the condition of the 7 Lincoln Avenue property was described by the Board of Health as follows: conditions found within the dwelling during an April 11, 2005 inspection conducted pursuant to an administrative warrant issued by the Salem District Court gave rise to the emergency finding of unfitness for human habitation and the determination that the property constituted an immediate danger to the health or safety, and well-being of the public. Specifically, the inspection revealed that the dwelling was vacant and contained significant quantities of animal feces and skeletal remains, human excrement, garbage, rubbish

and filth, as well as considerable structural damage throughout the building including plaster ceilings and walls that had collapsed, water damage in some areas, questionable roof integrity, exterior steps that had rotted, inoperable doors, an addition to the house that a tree had collapsed upon thereby exposing it to the weather for an undetermined amount of time, as well as a complete lack of heat, water, electricity, and sewage disposal system.

17. On October 13, 2005, the Manchester Board of Health ordered the Plaintiff to remedy the sanitary code violations at the 7 Lincoln Avenue property.

18. In the fall of 2005, Eastern Bank, for the first time, commenced proceedings to foreclose its mortgage on 7 Lincoln Avenue.

19. Eastern Bank scheduled a foreclosure sale of the 7 Lincoln Avenue property for January 19, 2006.

20. On January 16, 2006, the Plaintiff obtained a loan from Daniel Finn, Trustee of Highland Partners Realty Trust, in the amount of $20,000.00 in order to bring current her Eastern Bank loan, reinstate that loan, and cancel the foreclosure sale scheduled for January 19, 2006.

21. After receiving numerous complaints from neighbors regarding suspicious activity, loitering by teenagers, and an infestation of rats at the 7 Lincoln Avenue property, on March 30, 2006 the Manchester Board of Health determined that the property remained unfit for human habitation and issued to the Plaintiff another Condemnation Order, ordering that the Sanitary Code violations be remedied within forty-eight hours.

22. After receiving no response from the Plaintiff, on April 18, 2006, the Manchester Board of Health filed a lawsuit against the Plaintiff in the Essex Superior Court, ESCV2006-00685-A, seeking the appointment of a Receiver to remedy the code violations.

23. On or about June 29, 2006, the Essex County Superior Court appointed Attorney T. Richard Cuffe of Lynn, Massachusetts as Receiver for the property.

24. Following his appointment as Receiver, on August 1, 2006, Attorney Cuffe took out a $200,000.00 line of credit from Equitable Cooperative Bank, secured by a mortgage on the 7 Lincoln Avenue property.

25. $43,692.57 of this line of credit was used by Attorney Cuffe to cover the costs of maintenance and repairs to the 7 Lincoln Avenue property, and legal fees.

26. On December 14, 2006, the Manchester Board of Health voted to leave the 7 Lincoln Avenue property condemned after finding that it remained uninhabitable, and ordered that it be left vacated and secured until such

16

time as compliance with all applicable laws is achieved and the property
is declared habitable by the Board of Health.

27. On March 27, 2007, a Receivers [sic] Lien was established in the
amount of $43,692.57.

28. In early 2007, Eastern Bank again commenced proceedings to foreclose
its mortgage on 7 Lincoln Avenue.

29. Eastern Bank scheduled a second foreclosure sale of the 7 Lincoln
Avenue property for June 6, 2007.

30. On June 6, 2007, the Plaintiff and Defendant executed a loan document
entitled "Massachusetts Fixed Rate Mortgage and Construction Credit
Line" in the face amount of $210,000.00 in order to cancel the foreclosure
sale scheduled for the following day.

31. Portions of the proceeds of the loan the Plaintiff received from the
Defendant were used to pay-off the Plaintiff's 1988 Eastern Bank
mortgage, the Plaintiff's 2006 loan from Highland Partners Realty Trust,
the loan in favor of the Receiver and Equitable Cooperative Bank, and
other obligations of the Plaintiff.

32. The Plaintiff has admitted that the loan she received from the
Defendant was a last-ditch attempt by her to stop Eastern Bank's second
foreclosure sale.

Plaintiff does not agree with proposed fact 36 and also states that it is
immaterial [sic]

33. The Plaintiff Stated [sic] at her deposition that at the time of obtaining
the loan she was grateful for the opportunity the Defendant's loan gave
her.

34. The Plaintiff did not access the credit line designed to make available
repair monies, except for $6,000.00 which she used for the purchase of a
motor vehicle from Honda North.

35. The Defendant made the following dispursments [sic]: [none listed]

36. The Plaintiff never made a payment to the Defendant under the note
and mortgage.

37. The Defendant reminded the Plaintiff of her obligations regarding
payment and the submission of repair plans to the Town of Manchester by
letter dated January 29, 2008.

38. On October 29, 2008, the Defendant commenced proceedings to
foreclose its mortgage on 7 Lincoln Avenue.

39. A foreclosure sale of the 7 Lincoln Avenue property was scheduled for
August 15, 2009.

40. On August 11, 2009, the Plaintiff filed a bankruptcy petition in large
part in order to avoid the foreclosure sale scheduled for August 15, 2009.

The Debtor filed an Opposition to the Defendant's Motion for Summary Judgment, together with a Memorandum of Law in Support of Her Opposition. In addition, she filed a Response to the Statement of Undisputed Material Facts set forth in the Defendant's Memorandum in support of its Motion for Summary Judgment.

On February 23, 2011, the Court continued the Defendant's Motion for Summary Judgment generally and ordered the Chapter 7 trustee to file, within 30 days, either a notice of intent to abandon the Debtor's causes of action set forth in her adversary proceeding or a motion to substitute himself as plaintiff in the adversary proceeding. As noted above, the Trustee filed a Notice of Abandonment to which no objections were filed on March 24, 2011.

On June 9, 2011, the Defendant moved to dismiss the adversary proceeding pursuant to Fed. R. Civ. P. 12(b)(1), made applicable to this proceeding by Fed. R. Bankr. P. 7012. The Defendant, citing, inter alia, Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984), argued that the Court lacks subject matter jurisdiction over the adversary proceeding because the Chapter 7 Trustee abandoned the estate's interest in the Debtor's prepetition causes of action and, therefore, the outcome of the adversary proceeding could have no conceivable effect on the bankruptcy estate. In the alternative, the Defendant argued that, even were the Court to find "related-to" jurisdiction, the Court should exercise its discretion and abstain from hearing the adversary proceeding.

The Court scheduled a hearing on the Motion to Dismiss for July 25, 2011. The Debtor filed an Opposition on July 13, 2011 in which she noted that she had filed a motion

18

to convert her Chapter 7 case to a case under Chapter 13.

## III. DISCUSSION

 A. <u>The Debtor's Motion to Convert Case to Chapter 13</u>

  1. Positions of the Parties

 The Debtor argued that the Court has discretion to grant her Motion to Convert Case to Chapter 13, citing, among other cases, <u>In re Bange</u>, No. 08-40156-7C, 2010 WL 3829632 at *1 (Bankr. D. Kan. Sept. 23, 2010).  She also argued that she is eligible to be a Chapter 13 debtor because she has a regular source of income, namely monthly Social Security payments. She relied upon <u>In re Masterson</u>, 141 B.R. 84 (Bankr. E.D. Pa. 1992), for the proposition that her limited income should not bar reconversion of her case to Chapter 13. In <u>Masterson</u>, the court observed:

> Feasibility is one of the requirements, pursuant to 11 U.S.C. § 1325(a)(6), which must be satisfied to allow a Chapter 13 plan to be confirmed. However, in addressing the feasibility requirement in the context of a Chapter 13 case in <u>In re Capodanno</u>, 94 B.R. 62, 65 (Bankr. E.D. Pa. 1988), this court stated as follows:
>
> > [most] recent cases recognize that § 1325(a)(6) only requires that the Debtors' budget appears realistic and that the "expectations of income are sufficiently realistic that they should be given an opportunity to carry out the plan they propose." <u>In re Compton</u>, 88 B.R. 166, 167 (Bankr. S.D. Ohio 1988). <i>See also</i> <u>In re Frey</u>, 34 B.R. 607, 608–09 (Bankr. M.D. Pa. 1983); <u>In re Anderson</u>, 18 B.R. 763, 765 (Bankr. S.D. Ohio 1982); and <u>In re Perskin</u>, 9 B.R. 626, 632–33 (Bankr. N.D. Tex.1981).

<u>Masterson</u>, 141 B.R. at 88.

The Debtor also maintained that a Chapter 13 plan would be feasible because, in

19

addition to her regular source of income, she has a contingent form of income from the pending law suit against the Defendant.  She stated that her plan provides for "a small monthly dividend to creditors pending the resolution of the present litigation, or, in the alternative, pending receipt of a reverse mortgage," adding that "a significant portion of the work required to make Debtor's home habitable is complete."   At the hearing, her counsel admitted that "[a]s a prerequisite to obtaining a reverse mortgage she'd have to have some money to make substantial repairs on the property . . . ." He also stated that the Debtor would use funds recovered from the Defendant in the adversary proceeding to repair her home, at which point she would be able to obtain a reverse mortgage. Additionally, he recognized the difficulty of a 76-year old woman overseeing contractors.

The Debtor asserted that the Defendant is adequately protected by an equity cushion based upon an appraisal dated July 8, 2011.  According to W. William Adams, the appraiser engaged by the Debtor, whose appraisal she attached to her Memorandum, the value of the Property in its present condition is $410,000 "'as is', be it for rehabilitation or demolition."  Notably, that valuation is significantly higher than the valuation set forth in her Amended Schedule A filed on November 19, 2010 in the sum of $294,350.69.

The Debtor also pointed to changes in her circumstances as justifying conversion. She argued 1) that she has come to appreciate the viability of her claims against the Defendant, particularly in view of recent case law from the Supreme Judicial Court, *see* Commonwealth v. Fremont Investment & Loan, 452 Mass. 733, 897 N.E.2d 548 (2008), and the United States Court of Appeals for the First Circuit, *see* Frappier v. Countrywide Home

20

Loans, Inc., 645 F.3d 51 (1st Cir. 2011), 2) that the Chapter 7 Trustee has abandoned those claims, and 3) that public policy favors the repayment of debts, citing In re Hollar, 70 B.R. 337, 338-39 (Bankr. E.D. Tenn. 1987).

The Defendant argued that the Debtor failed to show a bona fide change in circumstances. It pointed to the absence of any increase in the Debtor's income, the Debtor's deposition testimony in which she testified that she knew and understood the terms of the loan, and the Debtor's response to its Motion for Relief from Stay filed in November of 2009 in which she referenced her predatory lending claims against it, suggesting that she has had an awareness of her claims from the outset of her case. The Defendant also challenged the Debtor's appraisal report, contending that the Property is in deplorable condition, particularly as it has been uninhabited since January of 2004 and was condemned in April of 2005, and its own appraisal report dated August 10, 2009 ($315,200 as of August 10, 2009). It urged the Court to reject the Debtor's assertion that reconversion to Chapter 13 is justified on the grounds of a recently discovered asset.

The Defendant also maintained that the Debtor would be unable to obtain confirmation of a Chapter 13 plan. It noted that the Debtor's amended Schedule J is devoid of provisions for common, unavoidable expenses for items such as medical care, laundry, real estate taxes, automobile insurance, and toiletries. In particular, it pointed to the reduction in the Debtor's food expenses from $300 to $200 per month. The Defendant contended that the Debtor's amended Schedule J was not submitted in good faith.

The Defendant also argued that the Debtor's proposed Chapter 13 plan cannot be

premised upon a speculative recovery in the adversary proceeding.  It cites The First Nat'l

Bank of Boston v. Fantasia (In re Fatasia), 211 B.R. 420, 423 (B.A.P 1st Cir. 1997) ("T]o satisfy

feasibility, a debtor's plan must have a reasonable likelihood of success, i.e., that it is likely

that the debtor will have the necessary resources to make all payments as directed by the

plan. 11 U.S.C. § 1325(a)(6). . . .,") for the proposition that a feasible Chapter 13 plan cannot

be based on speculation.

2. Applicable Law

Section 706(a) provides: "[t]he debtor may convert a case under this chapter to a case

under Chapter 11, 12, or 13 of this title at any time, if the case has not been converted under

section 1112, 1208, or 1307 of this title." 11 U.S.C. § 706(a).  Courts are split as to whether

a conversion from Chapter 13 to Chapter 7 permits a debtor to convert back to Chapter 13.

Some courts interpret § 706(a) to mean they have no discretion to convert a case back to

Chapter 13 if it was previously converted to Chapter 7, frequently referencing the plain

meaning of language utilized in that section.  *See, e.g.*, In re Fry, No. 04-16887, 2008 WL

4682266 at *2–3 (Bankr. D. Kan. Oct. 14, 2008); In re Muth, 378 B.R. 302, 302–04 (Bankr. D.

Colo. 2007); In re Hardin, 301 B.R. 298 (Bankr. C.D. Ill. 2003); In re Banks, 252 B.R. 399, 402

(Bankr. E.D. Mich. 2000).   Other courts permit reconversion under appropriate

circumstance. *See, e.g.*, In re Bange, No. 08-40156-7C, 2010 WL 3829632 at *1 (Bankr. D. Kan.

Sept. 23, 2010); In re Johnson, 376 B.R. 763 (Bank. D. M.M. 2007); In re Anderson, 354 B.R.

766, 768–69 (Bankr. D. S.C.2006); In re Masterson, 141 B.R. 84 (Bankr. E.D. Pa. 1992);  In re

Hollar, 70 B.R. 337, 338 (Bankr. E.D. Tenn. 1987).

22

Courts permitting reconversion have determined that "§ 706(a) is phrased as a restriction on the *debtor's* ability to convert a case . . . [and] . . .says nothing explicit about the *court's* authority to do so." *See* <u>In re Bange</u>, 2010 WL 3829632 at *1 (emphasis supplied). The court in <u>Bange</u>, observed, relying upon the language of § 706(c) ("The court may not convert a case under this chapter to a case under chapter 12 or 13 of this title unless the debtor requests or consents to such conversion."), that "[u]nlike subsection (a), this provision is phrased as a limitation on the bankruptcy court's authority to convert a case." <u>Id.</u> (citing 6 Collier on Bankruptcy, ¶ 706.04 at 706–8 (Resnick & Sommer, eds.-in-chief, 15th ed. rev. 2010)). The <u>Bange</u> court also observed that the wording of § 706(d) supports "the conclusion [that] the identification of the relevant actor in subsections (a) and (c) was no accident," as § 706(d) ("[n]otwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter"), is a limitation on conversion by either the debtor or the court. <u>Bange</u>, 2010 WL 3829632 at *1. In addition to relying upon the language used in subsections 706(a), (c) and (d), courts permitting reconversion note that it fosters "the general bankruptcy policy of encouraging debtors to choose to pay their debts to the extent they can." <u>Id.</u> (citing <u>Hollar</u>, 70 B.R. at 338).

At least one court has determined that § 706(a) is inapplicable and that reconversion may only occur pursuant to § 706(d). *See* <u>In re Buccolo</u>, 2009 WL 2132435 at *9 (D. N.J. July 13, 2009). In <u>Buccolo</u>, the court stated:

Section 706(d) allows Debtor to re-convert to a Chapter 13 case. A recent

Supreme Court decision holds that an analysis of §§ 109(e) and 1307(c) of the Bankruptcy Code must occur when confronted with an application of § 706(d). <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 372-73, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). Section 109(e) describes the parameters for a debtor to qualify as a debtor under Chapter 13. Section 1307(c)(5) provides that cause exists to dismiss a Chapter 13 case for "denial of confirmation of a plan under section 1325 of this title [ . . . ] ." 11 U.S.C. § 1307(c)(5). In turn, section 1325 of the Bankruptcy Code provides that "the plan must be proposed in good faith" and that "the debtor will be able to make all payments under the plan and to comply with the plan," commonly referred to as "feasibility" 11 U.S.C. § 1325(a)(4) and (6). Because subsection (d) provides Debtor with her only means of re-conversion, the Bankruptcy Court did not err in assessing §§ 109(e) and 1307(c), which includes feasibility. Case law also suggests that feasibility should be considered for re-conversion, specifically because motions for re-conversion are generally either granted or denied based on a feasibility analysis. *See* <u>In re Green</u>, 169 B.R. 480 (Bankr. S.D. Ga.1994). A Chapter 13 debtor, who converted her case to Chapter 7 and then re-converted back to Chapter 13, may not continue under her previously confirmed plan; rather, her new plan must be presented for confirmation, and must meet requirements of 11 U.S.C. § 1325. <u>Id.</u>

2008 WL 2132435 at *9 (footnotes omitted).

For those courts which hold that the reconversion is within the discretion of the bankruptcy court under § 706(a), the debtor bears the ultimate burden of proof.  <u>In re Manouchehri</u>, 320 B.R. 880, 884 (Bankr. N.D. Ohio 2004).

      3. Analysis

Based upon the decisions cited above, this Court adopts the reasoning of courts such as <u>Bange</u> and <u>Anderson</u> and concludes that it has discretion to permit reconversion of the Debtor's case to a case under Chapter 13 in appropriate circumstances.  The debtor's circumstances, however, must be closely scrutinized, *see* <u>Anderson</u> 354 B.R. at 769, and the debtor also must establish both good faith and the feasibility of any plan of reorganization.

24

The Court concludes based upon the existing record that the Debtor has not satisfied her burden of proof. The Court begins with the observation that any plan proposed by the Debtor *will not* require the payment of unsecured debt. The Debtor received a Chapter 7 discharge on January 12, 2010. Accordingly, the Debtor is no longer personally liable for prepetition claims and the only liabilities remaining are *in rem* claims against the Property. Moreover, to the extent the claims listed by the Debtor on Schedule D constitute judicial liens, they may not be avoided as she has not claimed an exemption of her interest in the Property. *See* 11 U.S.C. § 522(f)(2)(A). In view of the Debtor's failure to recognize those two circumstances, the Court finds the Debtor's arguments relative to the payment of unsecured debt is misplaced. To the extent that she were to recover any damages from the Defendant, those damages could only be used to pay the Chapter 13 Trustee's commission and counsel fees. Thus, public policy is not implicated in deciding the Debtor's Motion to Convert Case to Chapter 13.

Nevertheless, in <u>Johnson v. Home State Bank</u>, 501 U.S. 78 (1991), the United States Supreme Court held that a mortgage lien for which any personal obligation has been discharged in a Chapter 7 case remains a claim against the debtor that can be provided for in a Chapter 13 case. The Court explained:

> Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a "right to payment" in the form of its right to the proceeds from the sale of the debtor's property. Alternatively, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation. Either way, there can be no doubt that the surviving mortgage interest corresponds to an "enforceable obligation" of the debtor.

25

Id. at 84.

Although the Debtor may be entitled to Chapter 13 relief, her proposed plan, which has not been reduced to a writing, is devoid of substance. Given the undisputed facts in the record and the Debtor's advanced age, the Court cannot find that she has established that she has the ability to obtain confirmation of a Chapter 13 plan based upon her existing Schedule I and amended Schedule J. Moreover, her ability to prosecute her adversary proceeding, including testifying at trial, while simultaneously searching for and obtaining a reverse mortgage, engaging contractors, reviewing construction contracts and overseeing the rehabilitation of her Property in Manchester, Massachusetts while living in Beverly, Massachusetts is highly unlikely. She indicated that she has contacted contractors and explored her options with respect to obtaining a reverse mortgage, but, to date, she has not been successful in those endeavors and conversion to Chapter 13 is unlikely to produce different results. To the extent, the Debtor proposes to utilize funds awarded to her in this adversary proceeding after a trial on the merits and the resolution of any appeals to restore the Property and obtain a reverse mortgage, such a Chapter 13 plan would not be feasible, particularly in view of the number of months it might take to conclude the adversary proceeding and any appeal.

The Court does not lack sympathy for the Debtor, but the Chapter 13 plan outlined by her counsel in the Motion to Convert Case to Chapter 13 and at the hearing is at odds with what has transpired since her involuntary removal from her home in 2004 and what has transpired since she filed her bankruptcy petition on August 11, 2009, two years ago.

26

The Debtor has not been able to advance her cause in any significant way. In her
Complaint, which she filed in February of 2010, she indicated that she had found a few
contractors who had agreed to make some of the repairs and defer payment. She made
similar claims in her Motion to Convert Case to Chapter 13, yet she did not identify those
contractors, and this Court is skeptical that contractors would defer payment pending the
outcome of her litigation against the Defendant. Moreover, it is highly unlikely that the
Debtor could obtain a reverse mortgage and be able to use the proceeds to satisfy existing
secured debt and repair the Property. It would be a daunting task for a younger person or
even a trained architect, *see* <u>Youssef v. Fogerty (In re Forgerty)</u>, No. 08-1112, 2010 WL
916818 (Bankr. D. Mass. March 10, 2010). The Court concludes that the hurdles confronting
the Debtor in obtaining a reverse mortgage, rehabilitating her Property and returning there
to live at her advanced age, with her extremely limited income and resources, are
insurmountable. Although the Debtor owns an automobile, there is no indication that she
would be able to commute by automobile between Beverly and Manchester or to pay for
gasoline and the wear and tear on her automobile, in order to oversee repairs to the
Property. There is no evidence in the record from which this Court could infer that the
Debtor has the vigor to monitor repairs to the Property and oversee construction work
while engaged in litigation with the Defendant.

Under the foregoing circumstances, the Court finds that conversion of the Debtor's
case to a case under Chapter 13 would be futile. The Court, however, can envision a
scenario which would enable the Debtor to move forward in a constructive way, while

27

protecting the Defendant to the extent it were to prevail in the litigation. In the event, the Debtor were to forthwith propose and file a Chapter 13 plan predicated upon the sale of the Property and engage a real estate broker to aggressively market the Property for sale, the Court would entertain reconsideration of its order denying the Motion to Convert Case to Chapter 13.

      B. <u>The Defendant's Motion to Dismiss Adversary Complaint</u>

In the event that the Debtor fails to move for reconsideration of the Court's order denying her Motion to Convert Case to Chapter 13, consistent with the observations stated above, the Court shall enter an order dismissing the Debtor's Complaint without prejudice. Because the Debtor has received a discharge and the Chapter 7 Trustee has filed both a Notice of Abandonment of the causes of action set forth in the Complaint and a Report of No Distribution, the outcome of the Debtor's adversary proceeding against the Defendant can have no conceivable impact on the Chapter 7 bankruptcy estate. *See* <u>Boston Regional Med. Center, Inc. v. Reynolds (In re Boston Regional Med. Center, Inc.)</u>, 410 F.3d 100 (1st Cir. 2005). In that case, the court stated:

> The statutory grant of "related to" jurisdiction is quite broad. Congress deliberately allowed the cession of wide-ranging jurisdiction to the bankruptcy courts to enable them to deal efficiently and effectively with the entire universe of matters connected with bankruptcy estates. *See* <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir.1984). Thus, bankruptcy courts ordinarily may exercise related to jurisdiction as long as the outcome of the litigation "potentially [could] have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate." <u>In re G.S.F. Corp.</u>, 938 F.2d 1467, 1475 (1st Cir.1991) (quoting <u>In re Smith</u>, 866 F.2d 576, 580 (3d Cir.1989)).

In re Boston Regional Med. Center, Inc., 410 F.3d at 105.

As noted above, the outcome of the litigation can have no effect on the bankruptcy

estate.  The decision in In re Harris, 450 B.R. 324 (Bankr. D. Mass. 2011), is persuasive and

supports the Court's holding.  In that case, the court stated:

> In cases filed under Chapter 7, the validity of an asserted mortgage may also
> impact the administration of the bankruptcy estate. For instance, if voiding
> or reducing the asserted security interest leaves nonexempt equity available
> for distribution to unsecured creditors the bankruptcy estate is clearly
> impacted. Similarly, if the debtor has affirmative prepetition claims against
> the mortgagee, those claims vest in the Chapter 7 trustee, who may pursue
> recovery on the claims for the benefit of unsecured creditors. The bankruptcy
> court's jurisdiction may also be invoked by a purported mortgagee filing a
> proof of claim which would entitle that creditor, in the event that the claim
> is undersecured, to an aliquot share of the dividend payable to unsecured
> creditors. And if the bankruptcy court is asked by the purported mortgagee
> for relief from the automatic stay under § 362(a) for leave to initiate or
> continue a state court proceeding incident to foreclosure, the court has
> jurisdiction to address the questions arising from that request (but only to
> determine whether the movant has a colorable claim, *see* Grella v. Salem Five
> Cent Sav. Bank, 42 F.3d 26, 33–34 (1st Cir.1994)).

> None of those circumstances exist here. The Debtor has brought this case
> under Chapter 7. He has exempted the Property. The Trustee has chosen not
> to pursue the claims asserted by the Debtor. The purported mortgagee has
> not filed a proof of claim (and the deadline for filing one has passed). Even
> if a proof of claim had been filed, its validity would be irrelevant here
> because no dividend will be paid to unsecured creditors. And now the
> creditor has withdrawn its motion for relief from the automatic stay.

> There no longer remains any foothold in which to fasten jurisdiction over the
> remaining disputes regarding the Note or the Mortgage.

Harris, 450 B.R. at 334-35.  The same circumstances present in Harris are largely present

here.  Absent conversion, there is no jurisdictional foothold.

**IV. CONCLUSION**

In view of the foregoing, the Court shall enter an order denying the Motion to Convert Case to Chapter 13.  The Court shall defer ruling on the Motion to Dismiss the Adversary Proceeding for 14 days to afford the Debtor an opportunity to file a Motion to Reconsider the denial of her Motion to Convert Case to Chapter 13 together with a proposed Chapter 13 plan that is feasible.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August  22, 2011

30